VORTEX MFG. CO. et al. v. PLY–RITE CONTRACTING CO. et al.

District Court, D. Maryland. June 11, 1929.

No. 1250.

Albert H. Bates, of Cleveland, Ohio, for plaintiffs.

Donald A. Gardiner, of Washington, D. C., and Herbert R. O'Conor, of Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, District Judge. The bill of complaint, which is brought by the Vortex Manufacturing Company, an Ohio corporation, the exclusive licensee of Charles H. Parkin, deceased, and the Union Trust Company of Cleveland, executor of the Parkin Estate, against the Ply-Rite Contracting Company, a Maryland corporation, and five individuals, citizens of Maryland and officials and directors of that company, asks for relief on four separate grounds: (1) Infringement of Parkin patent, No. 1,282,460 (application filed February 15, 1916, and patent granted October 22, 1918), of which Charles H. Parkin was the inventor; (2) infringement of Bagnall and Taylor patent No. 1,239,074 (application filed June 16, 1916, and patent granted September 4, 1917), of which Parkin was the owner; (3) infringement of plaintiff's registered trade-mark "Par-Lock"; and (4) unfair competition. For convenience and simplicity, the parties plaintiff will be referred to in the singular number.

The alleged infringements and unfair competition relate to a process for applying plaster to concrete and masonry walls and ceilings. Prior to 1917 and 1918, when plaintiff's patents were granted, it had for a long while been common knowledge among contractors and builders that, if a plaster coat, namely, the finished layer, be applied directly to a cement structure, its adhesion was very weak, and the plaster was likely to fall off after a short while. Sometimes an injurious chemical reaction took place. Concrete structures being exceedingly porous and pervious to moisture, it was difficult, if not impossible, and always unhealthful, to apply a finished plaster coat thereto, and, even when no finishing coat was applied, the walls or ceilings were found frequently to be damp, streaked, or discolored. In other words, since an absorptive wall is porous, when the surface pores are filled with plaster, they act as mechanical keys to bond the plaster to the wall. In proportion as the pores are diminished in number, the roughness of the surface must be increased. So it

became customary to roughen the concrete surface by hacking or chopping it, but at best this was a clumsy method. If the surface was wet, the pores became filled with water, and the plaster could not be pushed into them. Some water is a necessary part in the chemical reactions involved in the hardening of plaster, and, if the wall is so dry as to suck the water out immediately, the hardening may be impeded or even prevented. Furthermore, it had become customary to allow a concrete wall to stand for a week or 10 days in order that it might "set" properly. This resulted in the plasterer's work as a whole being subject to considerable delay in completion.

In order to meet these difficulties, bond paints were used, but this method was found to be expensive, dirty, and, at best, uncertain. As a result of elaborate research work and experiments with bond paints, Parkin finally devised "a method of finishing and coating structural surfaces of the type set forth by arresting the passage of moisture from the structural body to the finished coating by means of an application of a moisture impervious fluid bond material, at normal temperature, to said structural surface, applying an inert material to said bond and subsequently applying a finished coating to said inert material, said inert material acting as a key or clutch for the reception and retention of a finished coating." Such is claim 1 of the Parkin patent. The other three claims are virtually identical, except that claims 2 and 4 call for the application of the bond material by force of impact. The principal advantages claimed for the patent are four, as summarized in the specifications: (1) Labor-saving, through mechanical application of the bond and the inert material; (2) economy by reason of a thinner application of the finished coat; (3) rapidity of application of the finished coat, due to elimination of suction; and (4) decrease in the dead load of the finished coat.

Parkin then found that the most efficient way of applying the bonding coat of asphalt to the wall or ceiling, and in turn the grit to the bonding coat, was first to blast the asphalt bonding coat on in the form of a liquid film with an air gun, and then to blow the grit into it, also with an air gun. This process is the basis of the Bagnall and Taylor patent, and is described thus (claim 4): "The process of coating a surface with viscous ductile material which consists of projecting toward said surface under pressure an annular stream of said material, and pro-

jecting into said stream at a point between its source and said surface a blast of air also turned toward said surface, at a pressure above that of the liquid."

Claims 1, 2, 3, 5, and 6 of this patent are substantially similar to claim 4 and to each other (such differences as do exist being hereinafter referred to). The remaining claim, 7, describes the method of imbedding the grit as follows: "The method of forming structural surfaces, which consists in applying to a given surface an adherent material, air blasting upon said layer a coating of a comminuted substance at such a pressure as to embed each particle about half of its depth, and finally applying a final coating to such comminuted substance so applied."

The most satisfactory results are produced by applying two coats of asphalt, a half-day apart. The inert material may be applied as quickly as 10 minutes after the second asphalt coat, and the plaster after a further minimum interval of 3 days. The fluid bond material may be composed of ordinary asphalt dissolved in naphtha, gasoline, or benzine, or similar solvent, although plaintiff claims that the best results are only obtainable by a secret formula for the blending of the materials which it refused to divulge, but the names of the materials and the formula strength are open matters. The compound must be of such consistency as to pass through the gun readily at 100° F. If the temperature where the work is being done is lower, it becomes necessary to add a small amount of "thinner," and in winter temperatures it is found advisable to warm the compound rather than to reduce it further with "thinners." Beyond this, temperature is not a factor in the process.

For this method as a whole Parkin adopted and registered the trade-name "Par-Lock" to denote a 100 per cent. locking of the plaster to the wall or ceiling, that is, a par-locking device. Licenses have been granted to some 20 concerns in the larger cities throughout the country to use the Par-Lock method; such licensees being called "Par-Lock Appliers." The business grew from a coverage of 1,000,000 square feet in 1922 to 8,500,000 square feet in 1927, and a grand total of more than 20,000,000 square feet since the process was put on the market. Among the licensees was one William Zeller of Baltimore who had in his employ Messrs. John Gunther and H. Elmer Cann, two of the present defendants. These men left Zeller and formed the Ply-Rite Contracting Company in 1926, made contracts for apply-

ing a coating of asphaltic material in a liquid form by means of an air gun substantially identical with that covered by the Bagnall and Taylor patent, and were able to take business from Zeller by reason of the fact that they used a bituminous asphalt, obtainable at a much lower price than the Trinidad asphalt that the Vortex Company supplied, because of greater durability, to Zeller and its other licensees.

The various defenses asserted by the defendants are as follows: First, as to the Parkin patent, there is a denial of the patent's validity upon three grounds: (1) That the Parkin process is not an invention over an aggregate of prior processes; (2) that the description in the Parkin patent is an insufficient disclosure to enable one skilled in the art to practice the invention; and (3) that the methods adopted before the Patent Office whereby the Parkin patent was obtained were tantamount to fraud. There is also a denial of infringement. Second, as to the Bagnall and Taylor patent, there is an admission of validity of claims 1 to 6 inclusive, though a denial of infringement, and a denial of both validity and infringement of claim 7. Third, as to the trade-mark, defendants deny infringement, alleging that neither by meaning, appearance, nor sound, is the name "Ply-Rite" so similar to "Par-Lock" as to tend to deceive or mislead. Fourth, and lastly, with respect to the charge of unfair competition, there is a denial and a countercharge that plaintiffs themselves have been guilty of unfair practices. These defenses will be considered in the above order.

### The Parkin Patent.

First, as to the claim that the Parkin patent is invalid, because the Parkin process is not an invention over an aggregate of prior processes. This claim is untenable because the record discloses that the Parkin process, as such, has never been anticipated —reproduced—by any prior patent. It is the *combination* with which we are concerned, not merely the various elements of that combination. Such elements, it is true, appear in one or more of the prior patents, but in none of them are they all united. Such prior patents furnish evidence of the prior state of the art, but cannot deprive the new combination of patentable novelty. We must not lose sight of the fact that the Parkin patent is for a "process," which, as stated by the Supreme Court in Cochrane v. Deener, 94 U. S. 780, 788 (24 L. Ed. 139), "is a mode of treatment of certain materials to produce a

given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

And again in Bates v. Coe, 98 U. S. 31, 48 (25 L. Ed. 68), the Supreme Court said: "Where the thing patented is an entirety, consisting of a single device or combination of old elements, incapable of division or separate use, the respondent cannot escape the charge of infringement by alleging or proving that a part of the entire thing is found in one prior patent or printed publication or machine, and another part in another prior exhibit, and still another part in a third one, and from the three or any greater number of such exhibits draw the conclusion that the patentee is not the original and first inventor of the patented improvement."

Similarly, the Court of Appeals for the Fourth Circuit has declared: "Where none of the prior inventors exhibits or suggests any co-operation of the elements upon the principle adopted by the patent in suit, or upon any principle adapted to serve the same purpose, the use of the old elements may limit, but cannot defeat, the patent. * * * The finding in the old devices, one portion here, one in another, and so on, should not defeat a patent for the combination, which is only truly anticipated by a prior device having identically the same elements, or their mechanical equivalents, co-operating to produce the same results." Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co., 139 F. 312, 319, 320.

Application of the asphalt to the concrete at *normal temperature* is an express limitation in every claim of the Parkin patent. The following description in the patent itself is very clear:

"In the use of the term 'normal temperature' as applied to the mastic or bond material it is intended to differentiate from this manner of application and the heating of the material before application or while being applied. Inasmuch as asphalt or like materials cannot be practically applied hot so as to entirely cover a surface and enter completely into the pores and interstices nor does it act in setting in the same manner as when properly cut and treated by solvents of its own nature and brought into a semi-fluid condition which it will retain indefinitely and normally thus allowing it to be applied to wet, green or damp surfaces as is often found necessary in work of this nature. Furthermore the applying of hot asphalt or the like to ceilings would result in not only imperfect workmanship but would also be dangerous to those working from below.

"It is also apparent that it would be impossible to overcome the plane of cleavage where hot or heated asphalt or like material is employed on the base inasmuch as in applying the same to a base of a lower temperature it would not fully, nor to any apparent extent, enter the pores or interstices of the base material and hence the plane of cleavage is always present."

The only extent to which variation in temperature becomes a factor in the process is when the asphalt fluid bond material is being applied in cold weather, and it is then sometimes found more practical to heat it slightly so that it will flow freely through the gun, rather than to thin it further with solvents. Defendants claim that, since it has itself applied the asphalt to the concrete, either in a heated condition or a cooled condition with respect to the surrounding atmosphere, or at the same temperature as the surrounding atmosphere with uniform results in each instance, it cannot therefor be said that the application at normal temperature is what produces the results claimed by plaintiff. But this argument merely evades the question, which is not whether there is proof of *prior application* of the asphalt at normal, or room temperatures by the defendants, but whether any of the prior patents show the process of the Parkin patent. This question must be answered in the negative. The Warthen patent, upon which defendants largely rely, is a process whereby melted asphalt is applied *hot* to the concrete surface, and thereafter the grit is imbedded. This is easily demonstrable as an impracticable method for walls and ceilings, although satisfactory for roofing, because the hot molten asphalt would not stay in place after cooling, if thus applied, and in any event would not properly hold the key or grit, because, as it cooled, its surface would glaze over; that is to say, the quick chilling of the asphalt would prevent both its own adherence to the concrete, and adherence of the grit or key to it. The operation relied upon

as having taken place in Troy, N. Y., admittedly did not embrace an application of "hot" asphalt.

An examination of the other patents relied upon by defendant discloses: (1) That for the most part they have absolutely nothing to do with any process for causing the adherence of plaster to any structural surface, since they relate to the application of asphalt to paving, glass tiles, etc., and to protective treatments for steel bridge construction, roofs and walls; and (2) that none of them calls for an application of asphalt to walls or ceilings, at normal temperature, in conjunction with the application of gravel or sand, and then plaster. A presumption of invention is not overcome by the fact that an expert may be able to build up the patented process by selecting parts taken from the prior art. That wisdom which comes after the fact will not be permitted to defeat the claim of him who first fully accomplishes the desired end, be it ever so simple, for in the law of patents it is the last step that wins. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 46 L. Ed. 968; Webster Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177.

Plaintiff contends that defendants have infringed not merely by using the Par-Lock process at a temperature identical with that under which the plaintiff operates, but as well when defendants purposely varied the temperature to some extent, one way or the other; that is, when, as in Philadelphia, defendants applied ice to the asphalt drums, and when, as in Troy, N. Y., defendants only slightly raised the temperature of the asphalt. We believe that this contention is sound. It does not result in a too liberal construction of the Parkin patent. It is not contended that Parkin was the pioneer in the art. But he was the first to discover a new and improved way of using an aggregate of old processes, and the discarding of hot asphalt and its adoption at normal temperature for walls and ceilings were the basis of his discovery.

The next argument raised against the validity of the Parkin patent is that its description of the kind or mixture of asphalt is not a sufficient disclosure to enable one skilled in the art to practice the invention. That the disclosure must fulfill the above requirement is, of course, clear, and is expressly so provided by section 4888 of the Revised Statutes (35 USCA § 33), which requires that the patent shall contain a description of the invention "and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same." What is the extent of the description of the bond or binding material given in the patent? Page 1, line 80, states that it is "preferably composed of an asphalt product so treated that it may be applied to the structure at normal temperature and without heating, forming a coating for the structural surface which is tough, elastic, and when applied, having sufficient flowing qualities so as to allow the bond or binding material 2 to enter thoroughly into the pores of the structure of base 1, and, while still in a sticky or semi-fluid condition adapted to receive and retain a subsequent coating and application of an inert material 3 thus, as it were, forming with the inert material a mastic which gradually hardens until it develops great adhesive strength and elasticity." And on page 2, line 40, it is stated that: "In the bonding material where asphalt is employed the asphalt is treated by solvents or its own nature renders it of such nature and consistency that it remains fluid or semi-fluid and can be applied to damp surfaces and will harden so as to be firm, tough and elastic, and will retain its adhesiveness, toughness and elasticity after applied in extremes of temperature even in cold storage places or in boiler-rooms or in other places of extreme cold or heat allowing for the varying expansions and contractions of the finish coating or base to which it is applied." Defendants contend that this description is not adequate, because it is the nature of the material, not its application to the structure at normal temperature, that is vital; that is, that it may be applied at normal temperature because of its peculiar nature. Plaintiff admits that it has a formula for mixing asphalt which it finds most satisfactory and which it refuses to divulge. But there is no concealment of the names of materials or of formula strength, but merely of the blending. Nor does it appear that defendants could not, by a reasonable amount of experimentation, obtain the identical and equally efficacious blending. Such is scarcely more than what a painter, skilled in his work, would do in the way of mixing his paints in order to produce the best results on a given job.

A patent for a process which, because of the varied character of the subject-matter, necessarily requires preliminary tests by the user in order to determine how it may most

successfully be applied, is not on that account invalid, provided the process is described in the claims with sufficient definiteness to guide those skilled in the art to a successful use of it. Minerals Separation Ltd. v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286. That is to say, a patent need not describe all possible modes of application, in order to obtain the best results which one skilled in the art might determine. We think that the process as here described meets the requirement above set forth. The best proof of this is that defendants were able in fact to carry out the process successfully in Baltimore and elsewhere, albeit they may not have succeeded in treating "green" or wet concrete surfaces. But by a reasonable amount of further tests it may be assumed that defendants would have become successful in this also. The position of defendants is inconsistent. First they argue that prior patents disclose the Parkin process; then they declare that the Parkin patent does not disclose its own process.

■ The true test of the patentability of a combination of prior processes is whether there has been brought together for the first time their different elements into a unitary whole forming a process that is both new and useful. Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U. S. 426, 38 S. Ct. 547, 62 L. Ed. 1196. We find that the Parkin patent meets this test. The novelty consists of the application to walls and ceilings of a moisture impervious fluid bond material at normal temperature in conjunction with the application of an inert material, and the plaster. Defendant asserts (1) that Parkin did not invent such bond material for use at normal temperature, because this is covered by a number of patents such as those to Lee, McClintock, and Haarmann. This is true with respect to the first two above named patents, but not with respect to the third, because under that patent (to Haarmann) the asphalt mastic is applied in a heated state. Defendant asserts (2) that Parkin was not the first to use gravel or sand as a key or clutch between the asphalt and the plaster, because this is covered in the patents to Worthen and New, to Coleman and to Shirra. This is true, with the important qualification that the Worthen and New and the Shirra patents both call for the application of the asphalt in a heated state; and the Coleman patent, while calling for a layer of slow drying or of oil paint, which we may assume to contain some asphalt, is expressly limited to the use of the combined elements as a structural preservative, and there is no claim that the object of the paint is to act as a key or clutch for a plaster layer, or finished coat. There is merely a spray of plaster, and the only function that the plaster performs is as part of the protective covering against the elements. Also while to be sure, in the claims, the "structure," whose surface it is the object of the patent to preserve, is not restricted to a "steel structure," it is so limited in the specifications, and is both an obvious and necessary limitation from the very nature of the process.

■ Lastly, defendants assert that Parkin was not the first to use all three elements, the bond material, the key, and the plaster, in the given combination because (1) the Coleman patent "discloses the entire combination of a viscous ductile material applied at normal temperature and sand imbedded therein to form a key and plaster applied to the key"; and (2) the Worthen and New patent "also exhausted the combination." Neither of these propositions is true because (1) the Coleman patent, for the reasons just given, has no application to finish coatings of plaster, and (2), as has already been pointed out, the Worthen and New patent is based upon the application of the asphalt in a heated state. So much for the novelty of the Parkin process. As to its utility, this is equally well established by the constantly increasing demand for it ever since made available to the public. Its use is widespread throughout the country, especially in public school buildings, hospitals, and the larger type of office buildings. In five years the plaintiff's volume of business, measured in square feet of application of the Par-Lock process, increased more than eight times. The process is now recommended extensively by the architectural profession. Because of the commercial success of the process, were there any doubt as to its patentability, such doubt should be resolved in favor of the patent. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Trane Co. v. Nash Engineering Co. (C. C. A.) 25 F.(2d) 267.

■ A plaintiff, alleging infringement, has the burden of proof. American Sulphite Pulp Co. v. Burgess Sulphite Co. (C. C. A.) 2 F.(2d) 6. The court finds that the present plaintiff has fully sustained this burden. With respect to the defense of invalidity and anticipation, the burden of proof rests upon the defendants invoking these defenses. Bates v. Coe, supra. The court finds that the defendant has failed to meet this burden of proof. Also, the court finds that the Parkin process is adequately described in each of the four claims, when read and interpreted, as

they must be, in the light of the specifications. Mitchell v. Tilghman, 19 Wall. 287, 22 L. Ed. 125; Greenawalt v. American Smelting & Refining Co. (C. C. A.) 10 F.(2d) 98; Nash Engineering Co. v. Cashin (C. C. A.) 13 F.(2d) 718; Franc-Strohmenger & Cowan v. Arthur Siegman, Inc. (C. C. A.) 27 F.(2d) 785; Economy Baler Co. v. Solar Sturges Mfg. Co. (C. C. A.) 29 F.(2d) 656.

The third argument advanced against the validity of the Parkin patent is that plaintiff made certain fraudulent misrepresentations before the Patent Office respecting its utility. It is admitted that one of the affidavits respecting the process used in a certain building, and the results obtained, was erroneous. Whether there was willful misrepresentation in this instance, or whether the Patent Office was in fact mislead by it, we are not now called upon to decide, in view of the firmly established principle that a defendant in an infringement suit may not raise the issue of fraud or deceit in the obtaining of the patent. Mowry v. Whitney, 14 Wall. 434, 20 L. Ed. 858; Electro-Bleaching Gas Co. v. Paradon Engineering Co. (D. C.) 8 F.(2d) 890.

### The Bagnall & Taylor Patent.

We turn now to the Bagnall and Taylor patent. There are seven claims under this patent, the validity of the first six being admitted, but both validity and infringement being denied as to the seventh claim.

The first six claims cover the method of applying the asphalt in a film to a concrete structure under air pressure. Summarized, these claims provide for the projection, under pressure, of a solid annular stream of asphalt from a gun, the nozzle of which is so constructed that there is a central stream of air, which expands the stream of asphalt, thereby reducing its thickness so that, as the cone enlarges, it becomes a film.

Although the answer denies the validity of the first six claims of this patent, and there was considerable evidence introduced in an attempt to show that various prior patents anticipated these claims, at the trial defendants' counsel abandoned any contention of anticipation, and relied upon noninfringement, alleging that defendants' apparatus atomizes the asphalt instead of putting it on in a film. The weight of the evidence, however, by those who have operated the defendants' gun is that the asphalt is projected from it on to the concrete surface in the form of a film, and the evidence as a whole is insufficient to satisfy the court that there is any real difference between the application of the asphalt by the plaintiff's gun, and by the defendants' gun. This must be true because of the similarity of construction of the two appliances. If the nozzle of either one be held close enough to the wall or ceiling so that it strikes the wall or ceiling while the conical sheet of asphalt is still intact, the film is more dense than if the nozzle is held so far away that the conical sheet of asphalt is spread apart, but in either case there is a film of asphalt reaching the wall or ceiling and driven into the interstices, which is different from merely spraying the liquid asphalt on to the wall or ceiling. The novelty of the process, as defined in claims 1, 2, 3, and 6, is the drawing or inflating of the viscous ductile material into a film by projecting the material towards the structural surface in an annular stream. Claims 4 and 5 of the patent do not employ the word "film." They, just as the other claims, define the process as consisting of the projecting of material under pressure in an annular stream, and explain the central air blast. Defendants' appliance operates in the same way, that is, with a central air blast and the surrounding asphalt, and there is no evidence that defendants have attempted to invert the situation, that is, change their appliance so as to operate with the asphalt in the center and the air on the outside; that is to say, by the common form of atomizing. This being true, it is clear that defendants have infringed the Bagnall and Taylor patent with respect to the first six claims, all of which the court finds to be valid.

We now turn to claim 7 of the Bagnall and Taylor patent, quoted in an earlier part of this opinion, which in much broader terms, calls for the application of the grit or key to the asphalt by air blasting. This process defendants contend is anticipated by several prior patents, and also that there is no infringement because, since the claim calls for the imbedding of each particle of the comminuted substance about half of its depth, and since defendants' sand or grit is approximately $\frac{1}{16}$ of an inch in diameter and the asphalt coating is less than $\frac{1}{64}$ of an inch, the sand or grit cannot be imbedded $\frac{1}{2}$ of its own depth.

Taking up first the argument of noninfringement, it seems to the court that this argument is too finely drawn and that the expression in the claim, "about half of its depth," may properly be given a somewhat liberal construction, that is, the construction for which the plaintiff contends; namely, that the expression simply means that the grit shall extend into the asphalt for a suffi-

cient distance, so as to be held fast, and still leave a sufficient portion of it projecting, so as to provide a clutch or bond for the final coating of plaster. As plaintiff points out, the imbedding of the various particles of grit or sand by air blasting causes the asphalt to pile up around the particles to some extent, so that, as a matter of fact, they may be imbedded to a greater depth than the normal thickness of the asphalt coating. The construction as here adopted is not without precedent. See Crozier-Straub, Inc., v. Thomas Graham (C. C. A.) 28 F.(2d) 321. ▌ Turning to the other question, that is, as to whether this claim is anticipated by prior patents, defendants rely especially on the patent to Worthen and New, to Hahn and to Coleman. In the Worthen and New patent, to which our attention has already been directed in connection with the Parkin patent, the invention consists of "coating the entire surface of a wall with asphaltum coal, candle or pine tar, or mixtures of like ingredients similar to those now in use, for the preservation of walls from dampness, and in these mixtures, while soft upon the walls, forcing in gravel, sand, sawdust or similar substances, which may be retained strongly in the mixtures, and afford, by their roughness, a sufficient clinch or hold for the plaster coat." No claim is made for any special method of *forcing in* the key material. However, this is considered as a sufficient anticipation of claim 7 of the Bagnall and Taylor patent, because "forcing" is broad enough to cover a variety of methods commonly used, including "air blasting." The two claims are not otherwise different, except in phraseology. Temperature is not a factor for present consideration, as it is in connection with the Parkin patent, for obviously under the seventh claim of Bagnall and Taylor, the bond material may be applied either in a molten state (as under Worthen and New) or at normal temperature.

The patent to Hahn consists of "applying a pasty substance, formed of such material as cement, lime, gypsum, etc., to the wall by the use of compressed air and following up the application of the pasty substance by an application of sand or other suitable amorphous material granulated or pulverized to the desired degree of fineness, the sand being also applied through the instrumentality of compressed air." The single claim of this patent is as follows: "The herein described wall finishing process consisting in simultaneously applying a sticky substance and a sandy substance, the one being applied slightly in advance of the other as

to location but without any appreciable lapse of time." In this patent, there is no special method claimed for forcing in the key material, unless we read into the claim what is contained in the specifications, namely, that the sand is applied "through the instrumentality of compressed air." But from what has already been said, it is clear that the claim must be read and interpreted in the light of the specifications. The term "air blasting," as used in claim 7 of the Bagnall and Taylor patent, therefore, must be taken as synonymous with the term "compressed air" in the Hahn specifications. However, in the Hahn patent, neither claim nor specification mentions a topcoating *of any kind;* the idea of the Hahn patent being merely to protect walls from the weather, at the same time giving them a sand texture finish. From what has already been said about the threefold nature of the Par-Lock process, and the distinction between a mere aggregation of old elements and their combination as a new unitary whole, it follows that this seventh claim of the Bagnall and Taylor patent was not anticipated by Hahn. The sand in the Hahn patent is not a "key" for anything.

Lastly we come to the Coleman patent, which we have also previously considered in connection with the Parkin patent, and the object of which we have also seen is preservative. This patent has three claims; the third one, which is as follows, being inclusive of everything in the other two claims, except that in them slow drying paint is substituted for oil paint: "A structural preservative consisting of a layer of oil-paint applied to the surface of the structure, an anchoring layer of granulated material embedded in but projecting from the surface of the paint, and a layer of cement secured to and covering the anchoring layer, substantially as described." Although none of these three claims actually sets forth the method by which the granulated material shall be applied, they do state it shall be applied "substantially as described," and, turning to the specifications, we find the statement that "while this layer of paint is still moist and tacky the surface is sprayed with comminuted lead or sharp sand." Since spraying contemplates, of course, the use of air, the method contemplated by each claim is basically the same. However, for the reasons heretofore explained, the third and essential element of plaster as a finished coat is totally lacking. Therefore, the seventh claim of the Bagnall and Taylor patent was not anticipated by the Coleman patent.

312

Summarizing the situation with respect to the Bagnall and Taylor patent we find, first, that the first six claims are valid, and that defendants have infringed them; and, second, that the remaining, or seventh claim, was anticipated by the Worthen and New patent, and therefore is invalid.

### The Trade-Mark.

We now come to a consideration of the third branch of the case, namely, plaintiff's contention that the trade-mark "Par-Lock" is infringed by the name "Ply-Rite." It is claimed that the similarity in sound and appearance of the two words, as well as in the thought suggested by them, is sufficient to constitute infringement.

There is some similarity in their sound. In pronouncing either word, one must pronounce the letters P, R and L. Both words are hyphenated, and contain not only the same number of letters, but each begins with the same letter, each has three letters in its first part, and four letters in the latter part. All of these facts may occasionally cause some confusion, especially when either word is sought to be expressed quickly or in quick repetition, as was evidenced during the course of the trial by unintentional interchange of the words by witnesses and counsel. It is claimed by plaintiff that the thought suggested by the two words is even more productive of confusion, especially because the words relate to the applying of materials to a surface; because those who do Par-Locking are known to the trade as "appliers," and because the name Ply-Rite suggests the right to apply.

The question of similarity of trade-names as applied to a particular product or process must of necessity be a matter of impression. Between the two extremes, the absolute copy of a name and a name which is radically and essentially different, there are innumerable other names with varying degrees of difference, and it is impossible to lay down a definite line of division between infringing and noninfringing names. The manner in which the alleged infringing word is written, used, or displayed, that is, the character of type employed, and other matters directly related to the display, must be taken into consideration. In the present case, the appearance of the two words is less similar than is their sound. In fact, the court finds no such simulation in the use of the word Ply-Rite on defendants' letterheads or otherwise, as would warrant a finding of infringement on the ground of appearance. The thought suggested by the two

words is not really productive of such confusion as plaintiff claims. It has no exclusive right to use the name "Appliers," and it is only through the added association of this word that the same idea is likely to arise. None of the cases to which we have been referred appear to go to the length sought by plaintiff. Nor does the court feel that there is such similarity in sound as to bring the word within the rule of infringement. If, therefore, there is not such substantial similarity in sound, appearance, or thought suggested, as to warrant a declaration of infringement on such grounds alone, are we justified, nevertheless, in extending the rule by reason of any other evidence in the case? Plaintiff contends that we are; that the general rule should be enforced more strictly against the present defendants because they are not business rivals on an equal footing, but have branched off from plaintiff's licensee, and have dealt with its customers and operated in defiance of its patents, and that, under such circumstances, it was all the more incumbent upon defendants to choose a name which could not possibly be confused with the trade-name of their original employee. But we do not think this sufficient, because, as has been said in a recent decision: "While an identity in meaning, or even an analogy therein, between the trade-mark word and the claimed infringing word, may well make out a case of deception by unfair competition, when taken in connection with other evidence, which alone would be insufficient, yet we are not aware of any authority which justifies finding infringement of a technical trade-mark from such analogy or identity only, unaccompanied by substantial similarity in appearance, display or sound, and we are not satisfied that any principle justifies the extension of the rule to such a case." Block v. Jung Arch Brace Co. (C. C. A.) 300 F. 308, 311.

### The Question of Unfair Competition.

This brings us to the last question, namely, whether, independently of the matter of trade-mark infringement, defendants have been guilty of unfair competition. In support of its contention that defendants' practices have been unfair, plaintiff showed instances of defendants having gone to the contractor on a particular piece of work after the architect had specified "Par-Lock," and having arranged to have Ply-Rite substituted; of having gone to the very customers of the plaintiff and underbid the plaintiff on the particular job, with the result that plaintiff was compelled to reduce

its price in order to obtain the contract; and of claiming, orally and in writing, that their material was fully equal to Par-Lock. There is, however, no proof that in any of these alleged instances did defendant actually attempt to palm, or pass off, their product as that of the plaintiff, or did they ever induce the actual breach of a contract. However, these are only two of the various practices that are actionable as unfair competition. Today the law of unfair competition is plastic. The test is simple, and lies in the answer to the question: Has the plaintiff's legitimate business been damaged through acts of the defendants which a court of equity would consider unfair? The court feels that the evidence requires an affirmative answer to this question. Through the peculiarly intimate knowledge which defendants had acquired of plaintiff's process, they were able to make serious inroads upon plaintiff's business, and the manner in which they did it was not without its element of unfairness. Intent is a vital element in questions of this kind. Defendants knew that they used a cheaper grade of asphalt in their bond material than did plaintiff. By reason of this fact defendants could, and had a legal right to, quote a cheaper price, but they did not have a right in so doing to state, as they did, that their material and process was fully equal to that of Par-Lock, whose process they were in the act of infringing. See Topliff v. Topliff, 145 U. S. 156, 12 S. Ct. 825, 36 L. Ed. 658.

 Defendants have not merely denied any claim of unfair competition, but have answered with a countercharge that plaintiff itself has been guilty of unfair practices; namely, that the plaintiff comes into court with unclean hands. They rely upon numerous letters, written to the trade, in which plaintiff stated that "any company putting sand in asphalt in any manner for the purpose of bonding the finish coat infringes the Par-Lock patents." However, it is well settled that to preclude a plaintiff from relief, his misrepresentations must be both intentional and material so as to constitute a deliberate fraud upon the public. Liberal allowance will be made for trade exaggerations. There is no evidence in the present case that such statements as the aforegoing exceeded the legal bounds. They should be taken as being at most an inaccurate analysis of plaintiff's patents which are referred to in the very same letters—an inaccuracy due rather to an excess of business zeal than to any deliberate misrepresentation. Furthermore, all of such statements appear to have been made prior to the filing of the present suit. In the absence of unusual circumstances, misrepresentations that have been discontinued before commencement of a suit cannot be availed of as a defense. That is, the defense of unclean hands, to prevail, must usually be based upon conditions existing at the time when equitable relief is sought. Coca-Cola Co. v. Koke Co., 254 U. S. 143, 41 S. Ct. 113, 65 L. Ed. 189; Moxie Nerve Food Co. v. Modox Co. (C. C.) 153 F. 487; Id. (C. C. A.) 162 F. 649.

 The fact that defendants may have discontinued their infringing practices is not sufficient to save them from both an injunction, and from an accounting in damages. Plaintiff, however, claims that defendants' conduct has been sufficiently aggravating and wanton as to warrant the imposing of treble damages permitted by the statute. But with this we are not inclined to agree. The assessing of such additional damages is entirely discretionary with the court.

A decree will be entered (1) declaring the Parkin patent valid as to all claims, and enjoining defendants from infringing it; (2) declaring valid, claims 1 to 6, inclusive, of the Bagnall and Taylor patent, and enjoining defendants from infringing any of these claims; (3) enjoining defendants from further unfair competition in the manner herein named; and (4) referring the case to a special master to determine and report the damages and profits.