### AMERICAN BITUMULS CO. v. UNION OIL CO. OF CALIFORNIA.

No. 328–M.

District Court, S. D. California, Central Division.

Oct. 4, 1938.

Pillsbury, Madison & Sutro and Felix Smith, all of San Francisco, Cal., and Lyon & Lyon and Leonard S. Lyon, all of Los Angeles, Cal., for plaintiff.

Harris, Kiech, Foster & Harris, and Ford W. Harris, Sr., all of Los Angeles, Cal. (Philip Subkow, Paul M. Gregg, and Andrews, Blanche & Klein, all of Los Angeles, Cal., of counsel), for defendant.

McCORMICK, District Judge.

This suit is in equity for an injunction and an accounting for the infringement of Letters Patent No. 1,643,675 of John Alexander Montgomerie. The complainant corporation, by duly made transfers and assignments, and by valid mesne conveyances, is the exclusive owner of all right, title and interest in the patent and of the invention therein described and claimed, as well as of all liberties and privileges granted by the patent, including the right to prevent and sue for infringement thereof.

The defendant is a corporation organized under the laws of California, with its principal place of business in Los Angeles, and within the jurisdiction of this court, and at its refinery and plant in Wilmington, California, it has, within six years prior to the filing of the bill of complaint herein, and after notice of the aforesaid patent, manufactured and marketed asphalt emulsion by processes during which a heated aqueous caustic alkaline solution is mixed with melted asphalt, which asphalt was derived entirely from oils of the California fields. It is contended that a method so employed by defendant invades the Montgomerie patent right.

The patent in suit is for "Bituminous Emulsion." It was issued upon an application filed in the United States June 13, 1924. After examination and consideration by the patent office continuously to April 15, 1927, the application resulted in the patent grant under date of September 27, 1927. Previously, the same process had been patented by Montgomerie in England under date of December 18, 1924, upon his application filed December 8, 1923. The British patent is No. 226,032.

The defendant by amended answer and also by "counterclaim" for declaratory relief under Section 274d of the Judicial Code, 28 U.S.C.A. § 400, and Equity Rule 30, 28 U.S.C.A. following section 723, urges in general (1) invalidity of the patent; (2) lack of invention or novelty; (3) limitation of the claims of the patent by the prior art and also by action in the patent office during the pendency of the application for patent; (4) non-infringement; and (5) insufficient proof of title in complainant. These defenses are amplified by twenty-seven specifications, but they all may be generally grouped into the five mentioned categories. Every defense and contention set up by the defendant has been examined and considered under the entire record and with the light of the voluminous "briefs," aggregating six hundred seventy-five printed pages, that have been filed by the respective solicitors. The closing brief was filed April 5, 1938.

It is considered sufficient to indicate by these conclusions the decision of the court on the issues of the suit presented under both the amended answer and the so-called "counterclaim" for declaratory relief, as the two pleadings raise identical questions.

The patent is for a process. A process in patent law is a mode or method of treatment of certain physical or chemical materials to produce a given result. Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139; Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279; Schumacher v. Buttonlath Mfg. Co., 9 Cir., 292 F. 522, 530. It does not include the or a product that may result from the employment of the protected method of manufacture. It is only to the extent that an asphalt emulsion processed according to the discovery embodied in the Montgomerie patent is new or superior or commercially more valuable than other comparable emulsion that the product per se becomes material in the consideration of the suit. But in such a way the product resultant from the process is relevant in the ascertainment of validity and the determination of scope of a patent exclusively for a process.

The two claims of the patent are in issue. They are:

"1. The process of producing a stable liquid emulsion consisting in mixing directly, while stirring, melted asphalt containing in its natural state a saponifiable material solid at normal temperature and dilute

aqueous caustic alkaline solution at a temperature of about 215° F., to effect a reaction between the alkali and the saponifiable ingredient of said asphalt.

"2. The process of producing a stable liquid emulsion consisting in melting Mexican asphalt which is solid at normal temperature then pouring it into a dilute aqueous caustic alkaline solution at a temperature of about 215° F. and stirring the mixture to effect a reaction between the alkali and one of the ingredients of said asphalt."

From the record before us we find that Montgomerie was working in what patent law characterizes "a crowded art," and that while he should not be classified as a pioneer inventor in the asphalt or bituminous emulsion art, he should be and is considered as a meritorious improver whose patented discovery has contributed heavily to successful and beneficial roadmaking in the United States and abroad. The evidence overwhelmingly shows that since Montgomerie discovered the process of making the emulsion described in his British and American patents, asphalt road construction has moved forward in an unprecedented way. This result, it is reasonable to deduce, is largely attributable to the intrinsic and inherent qualities of the Montgomerie discovery.

■ The patent, which is presumptively valid because of its issuance after deliberation and careful scrutiny by the patent office (Mumm v. Jacob E. Decker & Sons, 1937, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983), should be given sufficient protection in equity to make secure to its owner the fruits of the discovery. Eibel Process Co. v. Minnesota, etc., Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; National Battery Co. v. Richardson Co., 6 Cir., 1933, 63 F.2d 289.

The problem which confronted Montgomerie and all others who were experimenting in the field of chemistry pertaining to making and improving asphalt emulsions and the solution wrought by Montgomerie on December 6, 1923, is accurately and succinctly stated by the discoverer in the patent:

"This invention relates to the production of aqueous bituminous emulsions.

"It has heretofore been proposed to prepare an aqueous bituminous emulsion by melting bitumen, adding thereto, with agitation, a small proportion of fatty acid and/or resin or resin oil, and then adding, with agitation, a dilute solution of caustic soda or caustic potash or sodium or potassium carbonate at a temperature of about 215° to 225° F.

"As the result of experimental research I have ascertained that, in fact, a satisfactory emulsion may be prepared by direct treatment of the bitumen with dilute aqueous alkaline solution, that is without addition of fatty acid or resin or resin oil, if the melted bitumen is poured into the hot solution, with agitation, or if the hot solution is added rapidly to the bitumen, with agitation.

"My present invention consists in producing a bituminous emulsion by admixing directly with agitation, melted bitumen and a dilute aqueous alkaline solution.

"As an example in carrying out my present invention there may be used:—

"800 parts by weight of Mexican asphalt.

"4 parts of caustic potash.

"560 parts of water, in which the caustic potash is dissolved.

"It is preferable to pour the melted bitumen into the hot alkali solution, but, if desired, the hot alkali solution may be added to the melted bitumen. In either case the addition is made with agitation, e. g., by stirring, and the temperature of the mixture during the addition is maintained at about 100° C.

"The above example is given as one which has been found in practice to give an excellent result, but the nature of the alkali as also its ratio and the ratio of water to bitumen may be varied. It is impossible to define precisely the range of variation of these ratios, as this is influenced by the nature of the bitumen, but the quantities given in the example will be found to give good results with many different specimens of bitumen, as will also be the case if instead of 4 parts of caustic potash there be used in the example 6 parts thereof."

■ Nowhere in any of the extensive prior art that has been offered by the defendant company is there any information disclosed or knowledge imparted which reveals that the acidic constituents or ingredients of asphalt would themselves provide a necessary emulsifying agent when reacted with caustic alkali. Nor does the record contain any earlier reference which clearly imparts knowledge that asphalts solid at normal temperatures exist containing saponifiable substances having the intrinsic power, when

reacted with caustic alkali, to emulsify the asphalt. The patent in suit having clearly disclosed such discoveries, the burden of disestablishing their novelty or patentable aspects rests upon defendant. This the defendant has not sustained.

■ "A process patent," says the Supreme Court in Carnegie Steel Co. v. Cambria, etc., 185 U.S. 403, 425, 22 S.Ct. 698, 707, 46 L.Ed. 968, "can only be anticipated by a similar process." It is not sufficient that after a newly discovered patented chemical process is revealed expert witnesses can then for the first time, by taking prior references and giving opinions as to what is to be assumed from such references, employ the protected process. Such procedure neither establishes anticipation nor avoids infringement. This is especially true where, as here, there is an absence of proof that anyone before Montgomerie used such process to emulsify asphalt.

In road building or highway construction, which is the industry with which we are specially concerned in this suit, and to which activities the record before us is largely devoted, we find that there are generally two major requirements in the processing of an efficient asphalt emulsion which render the product completely employable in such activities:

1. It must have "stability," and the quality of resisting settlement; in other words, the emulsion must be so processed that it will, after manufacture, remain emulsified until used on the road. The particles of asphalt that are dispersed in the water of the emulsion should be formed in such a way that the film forming around such particles remains in the emulsified mass so that in shipment or in storage and until use in road making they retain in cold state the qualities that prevent segregation or stickiness and obviate the necessity of restirring or heating or again mixing before using on the highway; and

2. And perhaps most important, the mixture must possess "demulsibility power," which is the quality of the emulsified mass to separate the water from the asphalt, or what is termed in the industry as the "breaking" action of the emulsion when it is applied or mixed and comes into contact with stone, gravel, or other road material that acts on the emulsion the same as stone. This is an all-important cementation feature of asphalt in roads and highways. It brings about coalescence of the particles of asphalt, destroying the emulsion and effecting a binding material.

The record before us shows that in accredited tests where the Montgomerie process was used with many different asphalts the percentage of the asphalt in the emulsion that coalesced and "broke" in a definite time ranged from thirty-five per cent. to one hundred per cent. of the asphalt, as compared with not over six per cent. with any asphalt where "soap type" processes were employed under similar conditions. There was only one asphalt sample that showed a demulsibility as low as thirty-five per cent. with the Montgomerie process, and the evidence as to this sample is so nebulous that it can hardly be regarded as a criterion of the demulsibility of asphalt processed according to the Montgomerie patent. All of the other samples ranged around ninety per cent.

In order to attain the requirements in asphalt road building that have been mentioned it is paramount as to what emulsifying agent is employed in the process of making the asphalt emulsion. It has been shown in this suit that all the earlier and so-called "soap type" emulsifying agents, concerning which more will be stated later in this memorandum, were deficient and unsatisfactory in road making activities, and until the Montgomerie patented process was discovered, one very efficient way of building and repairing highways, known as the "penetrative method," had been practically abandoned because of inability to make an aqueous asphalt emulsion containing these necessary attributes of "stability" in storage or transportation, and "quick breaking" in use, or as it is technically called, "high demulsibility." All "soap types" having high demulsibility lack stability.

■ By Montgomerie's process a previously required step is omitted and the result of this omission has been shown to be revolutionary. Such a discovery is clearly patentable. Halliburton v. Honolulu Oil Corp., 9 Cir., 98 F.2d 436, July 11, 1938, 38 U.S.P.Q. No. 7, p. 304; Lawther v. Hamilton, 124 U.S. 1, 8 S.Ct. 342, 31 L.Ed. 325; Aerovox Corp. v. Concourse Electric Co., 2 Cir., 65 F.2d 386, 388.

■ Before Montgomerie's invention it had always been deemed necessary in processing an asphalt emulsion to add some other fatty material such as fatty acid or resin or resin oil to the asphalt or to the aqueous caustic solution to effect emulsification, and

it was merely accidental that Montgomerie discovered that the step of introducing the fatty material could be advantageously and successfully omitted in the process and that emulsification proceeds much more efficiently and commercially usefully by the saponification of the natural saponifiable materials inherent in the asphalt itself. Therein we think lies the essence of the patented invention under consideration in this suit.

The situation is similar to one considered by Judge Gilbert in Pacific Contracting Company . v. Bingham, C.C., 62 F. 281, where, in discussing a process patent relating to the preparation of asphalt paving material for use which omitted a previously supposed essential step, he said [page 284]: "What they added was the idea of the immediate use and compression of the steam-softened material into pavement without the expulsion of the moisture, or perhaps it would be more accurate to say they omitted from the Dietrich process a step which Dietrich and all others considered essential, namely, the evaporation of the moisture which had been introduced in the steaming process. Therein is the essence of the Thurber invention."

The gravamen of the defendant's position on the effect of the prior art is that the process embodied in the patent in suit does not differ substantially or in kind from the earlier known procedures for emulsifying asphalt or bitumen which the record shows to have been generally classified in the art as "soap type emulsions." Many such asphalt emulsions had been in use long prior to Montgomerie's experiments and discovery of December 6, 1923. It was largely to overcome one of these found in a British patent to MacKay, No. 202,021, issued August 9, 1923, that Montgomerie was experimenting when by chance he made the discovery that is claimed and embodied in patent No. 1,643,675.

There are hints in the literature and references earlier than December, 1923, relating to bitumen and allied subjects that asphalt itself contains saponifiable material which when mixed with caustic alkali has the power of stabilizing bituminous emulsions, but the significant thing about these allusions and all of the other prior art that has been urged in this case is that no one, until Montgomerie performed his experiments in the latter part of 1923, conceived or disclosed what Montgomerie ascertained and patented. The fact that Montgomerie did not know how to describe precisely the saponifying material which he discovered to be inherent in the asphalt does not nullify his momentous discovery.

The argument of the defendant proceeds also on the theory that the difference between the so-called "soap type" methods and the Montgomerie process being merely in degree, patentable discovery is defeated. We think these contentions are untenable under the evidence in the suit and under applicable authority in chemical process patent litigation.

It should be noted in this connection that the differing qualities of the earlier or "soap type" processes for making asphalt emulsion and the one discovered by Montgomerie and later claimed in his patent are not confined to the mere "leaving out" of soap forming material, but also consist of the resultant which acts dissimilarly. The emulsion produced by Montgomerie, we find, to adopt the language of an admittedly learned witness who testified at the hearing: "Whether it were called soap or not, it does not behave like the ordinary sodium oleate. This material does act differently, and produces this quick breaking emulsion, whereas the soap type emulsion containing the well known fatty acids do not produce this quick breaking emulsion. The two materials, are, in fact, quite different."

This "quick breaking" attribute of the Montgomerie process has been clearly shown to have been entirely new and very valuable. There is a circumstance shown by the evidence which indicates that the defendant itself regarded Montgomerie's quick breaking asphalt emulsion as novel, distinctive, and valuable in industry.

When the new processed emulsion first appeared on the market, it was obtainable solely from plaintiff's predecessor, and the defendant company got its supply thereof for the market from such source. Later when the defendant upon demand refused to recognize patent rights in the processed emulsion, the plaintiff's predecessor declined to supply the defendant with its emulsion, whereupon the defendant's engineers and chemists proceeded with studies and experiments in order to process a satisfactory cold asphalt emulsion that would enable it to hold its market for such product and compete with complainant and its predecessor who owned the patent rights in suit.

The outcome of such investigations was a process that is accused of being an infringement of the Montgomerie patent. A

description of this process of defendant in United States patent No. 2,022,229, applied for March 20, 1934, by the assistant manager of research for the defendant, so closely follows the wording and syntax of portions of the text of Montgomerie's patent as to justify the inference that the earlier Montgomerie patent disclosed and taught defendant company and its agents its accused process.

Earlier in this memorandum attention is directed to the extent to which the product of the Montgomerie process may be considered as affecting the question of invention, but considering the proof that a previously unknown and non-existent superior product has resulted from the practice of the Montgomerie process, thereby bringing about a new article of commerce and industry, it is clear that Montgomerie's contribution to the art is more than one of degree and assumes the dignity of a patentable invention. Halliburton v. Honolulu Oil Corp., supra; Miami Copper Co. v. Minerals Separation, Ltd., 3 Cir., 244 F. 752, 756.

But even if the Montgomerie discovery should be properly relegated to one of mere degree, which we think is not the case, nevertheless, because of the drastic changes which it has brought in the paving of highways, it amounts to a patentable invention. Corona Chemical Co. v. Latimer Chemical Co., 8 Cir., 248 F. 493. In this case the court stated [page 494]: "The granting of a patent creates a presumption of patentable invention. In so recondite a science as chemistry a difference in degree may produce revolutionary results."

There can be no doubt under the evidence that since Montgomerie's discovery there have been great progress and unprecedented improvements in asphalt road making that are attributable entirely to the intrinsic merits of Montgomerie's discovery as it is specified and claimed in the patent under consideration. This commercial success should be and is given some weight upon the issues of patent validity and infringement. Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 284, 79 L.Ed. 721; Eibel Process Co. v. Minnesota, etc., Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

It is quite probable that the essence of the patented process may now seem simple and obvious "in the light of the accomplished result." It may even appear strange, in the light of its simplicity, that the discovery was not made earlier. But

these features have never been sufficient to nullify a patent which is shown, as the process patent in suit has been shown, to have advanced an art materially and to have resulted in widespread commercial use. Diamond Rubber Co. v. Consolidated Rubber Co., 220 U.S. 428, 434, 31 S.Ct. 444, 55 L.Ed. 527; Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177. In this suit the testimony of scholarly and skillful expert witnesses established that at the time of Montgomerie's discovery no one knew the exact nature of the acidic contents existing in asphalt, and it is, according to the same credible authority, still to some extent a matter of scientific and chemical conjecture as to what are the properties of the substances in asphalt that saponify by being treated with alkali. This paucity of information and scientific knowledge undoubtedly was the justifiable reason for the truthfully guarded statement made to the patent office and at its examiner's request during the pendency of Montgomerie's application, which statement now appears in the patent as follows: "It is believed that the ingredient of Mexican asphalt saponified by the treatment with alkali is one or other of the carboxylic acid derivatives or hydroxy derivatives of the naphthenes or a mixture of these. The properties of these substances have not yet been fully investigated by chemists."

The statement is but an explanation, responsive to a patent examiner's inquiry, of what Montgomerie had already generally described in his sworn application for patent and did not, under the circumstances shown by the evidence, require any further oath than that which appears by the file wrapper to have accompanied the patent application. Michigan Carton Co. v. Sutherland Paper Co., 6 Cir., 29 F.2d 179, 184.

Montgomerie's explanation of what he understood to be the composition or properties of the saponifying agent inherent in the asphalt did not in any material way alter the steps to be taken in performing the process according to the wording of the patent which has been quoted earlier in this memorandum.

Another objection to the Montgomerie patent is that it is invalid for lack of proper disclosure. The evidence clearly removes this objection and renders it without merit. Experiments performed in the court room during the hearing on the merits, and others shown by the record to have been performed elsewhere, demonstrate the suffi-

ciency of the disclosures of the patent process within the four corners of the letters patent, to meet the requirements of the law. The certainty required is that which is reasonably clear to those skilled in the art. Minerals Separation v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286.

The defendant has conceded the utility of the emulsion produced by the process claimed in the patent. This concession is nearly equivalent to an admission of the sufficiency of the patent disclosures, but entirely aside from the effect of defendant's recognition of utility of the resultant from Montgomerie's process, the demonstrations to which we have adverted show that at least one specific way is clearly pointed out in the patent by which the process is performed. This is sufficient. Sec. 4888, Revised Statutes, 35 U.S.C.A. § 33; Tilghman v. Proctor, supra; Schumacher v. Buttonlath, etc., supra.

The patent is explicit as to what type of asphalt is to be used in the process— "Mexican asphalt." This petroleum product or residue has been shown by the evidence to have typical and definitely ascertainable saponification characteristics which do not appear to be present in all asphalts. But it is obvious that any asphalt solid at normal temperatures suitable for general use in highway construction which inherently contains the substantially saponifying material or value, when reacted with aqueous alkaline solution, that are found in the "Mexican asphalt" used by Montgomerie in his experiments of December 6, 1923, which has been clearly identified in the record as plaintiff's exhibit 5, comes within the nomenclature used in the patent and its two claims, regardless of whether the asphalt is a residue of crude oil derived in Californian or Mexican oil fields. Standard Paint Co. v. Bird, C.C., 175 F. 346, 357, affirmed on opinion, 2 Cir., 182 F. 1023.

Moreover, the evidence at the hearing showed that in the branch of chemical science relating to saponification there is an analysis index which shows the saponification value of different asphalts. It further appears that an asphalt which upon analysis has a saponification value or number of 0.5 or less cannot be emulsified by the Montgomerie process, but that asphalts whose saponification value is demonstrated to be 1.0 or more emulsify readily by the Montgomerie process. The asphalt used by the defendant company in the processing of its emulsion has a saponification value of 1.44.

We think in the light of the revolutionary accomplishments of the Montgomerie process that the application of this analysis index for saponification value will enable those skilled in the art to determine readily whether or not any asphalt comes within the purview of the claims of the patent.

Having reached the conclusion from the entire record that the complainant has established title to the patent, and that the defendant has failed to sustain any defense of invalidity or lack of novelty or narrow limitation, we find the patent in suit to constitute a meritorious discovery and invention of great value, and that its two claims are entitled to a broad range of equivalents (Reinharts, Inc. v. Caterpillar Tractor Co., 9 Cir., 85 F.2d 628), and we come to consider the question of infringement.

This issue is relatively simple under the record made in this suit. If the claims of the patent are to be given liberal treatment, then a process commercially practiced by the defendant company in its refineries at Wilmington and Oleum, California, is undoubtedly an infringement of both of the Montgomerie claims.

With the exception of the apparatus that is utilized to process the asphalt emulsion, there is no substantial or material difference in the processing that is done at either of the California plants of the defendant company. The form or type of apparatus is entirely inconsequential in this suit. It is the chemical process itself that concerns us and not the purely physical instrumentalities that are used to operate the process. In other words, the patent covers a process per se, regardless of the mechanical means employed in practicing it. Tilghman v. Proctor, supra; Moore Filter Co. v. Tonopah-Belmont Development Co., 3 Cir., 201 F. 532, 541.

The defendant's asphalt emulsion processing that is material to our inquiry in this suit is done substantially as follows: A water storage tank is positioned in the refinery, and by means of a pipe line is connected to horizontal mixing tanks. Each mixing tank is provided with appropriate inlet and discharge lines, and at one extremity with a vertically positioned line which at its upper end contains a funnel through which caustic alkali material may be introduced. An electrically driven centrifugal circulating pump with a speed of

2,880 revolutions per minute and a discharge pressure of 75 or 80 pounds is connected by piping and valves to the mixing tanks. A mixer having inside strainer-like orifices which function to augment mixing or stirring of liquid matter is connected to the discharge side of the circulating pump. A cooler which serves to cool water, caustic solution or emulsified asphalt is connected to the discharge side of the mixer. The materials to be cooled are introduced into this cooler by means of a pipe line from the mixer, and are discharged through another pipe line which is connected to both of the mixing tanks. Thus there is a cycle of instrumentalities through which the heated material to be processed is mixed, stirred or agitated, circulated and cooled. The mechanical equipment in defendant's plant is illustrated by a drawing in evidence as exhibit L. It is unnecessary to describe it more precisely in this memorandum.

The operation is carried out by directing the amount of water necessary to produce the desired quantity of an asphalt emulsion from the water storage tank to a mixing tank. The defendant uses distilled water obtained by condensing exhaust steam in its refinery. Hot water is cooled to not less than 105° F. nor more than 120° F. before being used in the mixing tanks. Caustic soda equivalent to 0.11 per cent. by weight of the finished emulsion is used in such heated water and is funneled into it in the mixing tank. The solution or contents of the mixing tank are then circulated through the draw-off line through the pump, mixer and water cooler back into the mixing tank. This cycle is maintained without adding asphalt until the water and caustic are completely mixed and the temperature of the dilute caustic solution has been cooled to not over 120° F. When this has been accomplished the ebullient asphalt is added. This is done by connecting the asphalt supply line to a tank containing heated asphalt that is in liquid state. The temperature of this asphalt ranges from 280° F. to 350° F., the average temperature of the asphalt upon introduction and at the initial emulsification in defendant's process being 310° F. This hot liquid asphalt is pumped through a steam jacketed valve into the discharge line of the centrifugal circulating pump and thereupon the asphalt commingles and emulsifies with the heated aqueous caustic alkaline solution which is being pumped from the mixing tank, and mixing and emulsification extends as the materials continuously circulate through the mixer,

cooler, mixing tank and pump. The hot asphalt at the aforesaid temperatures is continuously injected until the desired asphaltic volume in the finished emulsion has been reached according to a measuring instrument. The circulation is continued after emulsification until the temperature of the contents of the mixing tank is reduced to approximately 125° F., when the finished product is drawn out of the mixing tank and stored in receptacles for the market.

Another general description of the accused process has been briefly stated by a major engineer of the research department of the defendant company, as follows: "The process consists in preparing an aqueous solution containing approximately 33/100ths per cent. caustic soda by weight on the solution, and having this solution at a temperature of about 100 to 110 degrees (F.) and then circulating that fluid material through a pump, and injecting into the circulating stream hot asphalt, the asphalt being in the neighborhood of 275 to 325 degrees (F.), and by continuous injection of the asphalt to build up an asphalt content in the mixture of say 50 to 65 per cent."

The evidence shows that the "usual" or "average" temperature of the emulsion just after the confluence of the very hot melted asphalt and the heated aqueous solution in the circulating appliance is about 165° F. This shows that defendant's process is operated at elevated temperatures that are always high enough to enable the asphalt to be broken up into droplets in the water. Tests of identity which are recognized by those skilled in the art prove that the defendant by introducing the asphalt at a temperature of more than 100° C. into the dilute caustic alkaline solution having a temperature of less than 100° C. but around 110° F. accomplishes the same result and produces the same type of quick breaking emulsion with the same high alkalinity and demulsibility characteristics and the same naturally occurring saponification values as follow from the employment of the Montgomerie process in accordance with a specific example given in the patent.

There is no difference discernible or scientifically ascertainable in the product whether the asphalt is very hot and the alkali cooler or vice versa, or whether both are approximately the same temperature, as long as they are within a range where the asphalt is sufficiently melted to flow freely into the alkali. It clearly appears that the asphalt of the defendant company, ex-

hibits 25 and 26 respectively, and the "Mexican asphalt," exhibit 5, each are sufficiently heated to emulsify according to the Montgomerie process when the temperature of the mixture at the time of emulsification is about 170° F. The emulsification of the two heated materials takes place almost immediately after one. is stirringly injected, poured or introduced into the other, and while the temperature specified in the patent, to-wit, about 215° F., refers to the temperature existent at the mixing, the latitude of heat expressly connoted by the use of the word "about" in the patent and the patent office actions in relation to temperature further shows that precise temperature is not of the essence of the Montgomerie patented process.

We think that the temperature variations between the Montgomerie process and defendant's methods do not avoid infringement of the basic patent under consideration. Tilghman v. Proctor, supra; Vortex Mfg. Co. v. Ply-Rite Contracting Co., D.C., 33 F.2d 302.

It is argued that no infringement has been established by complainant because the defendant company uses a fluid asphalt. The Montgomerie process calls for the use of "melted asphalt containing in its natural state a saponifiable material solid at normal temperatures" in claim 1, and "Mexican asphalt which is solid at normal temperature" in claim 2.

In considering the patent and in endeavoring to interpret fairly its meaning and scope one should bear in mind the use for which the process is intended as stated in the text of the grant itself, and as illuminated by the evidence in the suit. The patent specifies among other uses that "An emulsion produced as above described may be used as a binding medium in road making," and as we have previously observed, "highway construction" is the activity which interests both the complainant as owner of the Montgomerie patent and the defendant company in the employment of the accused process.

Both methods which are under consideration require and necessitate that the asphalt which is used be heated and liquefied so that it can be poured, injected or introduced into the aqueous alkaline solution to form an emulsion, and to render the emulsion which is' thus formed usable in the paving operations for which it is intended. Neither "Mexican asphalt" described in the patent and shown in evidence as exhibit 5, nor defendant's asphalts exhibits 25 and 26 respectively, can be emulsified for highway purposes or used in road making without being by elevated temperatures rendered more fluid than they are in the cold or natural state. We think that for practical purposes, from the standpoint of use, and within the scope of the patent, all three asphalts are classified as solid at normal temperature.

It is clear to us from the entire record that complainant has established infringement by the defendant company of claims 1 and 2 of the patent in suit by the process which we have substantially described in this memorandum and which the record shows is employed in producing its finished emulsion described in the evidence as "penetration or quick breaking P type emulsion." This product is manufactured solely with the two ingredients of Montgomerie's process and without the addition of fatty acid or other saponifiable material.

The defendant company manufactures another emulsion known as "mixing or slow breaking emulsion" in which resin oil or resin soap is used and not inherently introduced into the process. This product is not processed solely with dilute aqueous alkaline solution by direct treatment with melted asphalt alone, but requires, and has, the additional placing into it of resin oil or soap. Such process is without the scope and purview of either of the claims of Montgomerie No. 1,643,675.

The foregoing "Conclusions of the Court," together with such findings of fact and conclusions of law proposed in plaintiff's opening brief and in conformity hereto as may be submitted and adopted, constitute the findings of fact and conclusions of law pursuant to Equity Rule 70½, 28 U.S.. C.A. following section 723, and a decree of injunction and for an accounting is accordingly ordered for plaintiff and against defendant, with costs. Exceptions allowed each party on all adverse rulings. Solicitors for plaintiff will serve and present appropriate findings, conclusions and decree.