### B. B. CHEMICAL CO. v. ELLIS et al.
### No. 4642.

District Court, D. Massachusetts.

April 24, 1940.

A. D. Salinger, Fish, Richardson & Neave, and C. E. Hammett, Jr., all of Boston, Mass., for plaintiff.

William Gates, Jr., and Roberts, Cushman & Woodberry, all of Boston, Mass., for defendants.

James R. Hodder, of Boston, Mass., for defendants Elmer A. Ellis, and Magic Tape Co.

BREWSTER, District Judge.

This is an infringement suit, presenting only two issues, (1) the issue of infringement, and (2) the issue whether, as a result of plaintiff's manner of conducting its business, it and its licensees have, in fact, secured a virtual monopoly in the manufacture and sale of unpatented materials. The word "defendant", as herein used, means the corporate defendant Magic Tape Corporation unless otherwise indicated.

### Statement of Facts.

1. The defendant is a Massachusetts corporation with an outstanding capital stock of twenty-five shares, of which the defendant Ellis and his wife own twenty-four. The defendant Ellis is treasurer and general manager of the defendant, which maintains its office in the house of the defendant Ellis. This defendant personally developed and first introduced the process alleged to be the infringing process.

2. On November 3, 1931, Letters Patent of the United States No. 1,830,428 were issued to the defendant Ellis, assignor to the plaintiff. For this assignment the plaintiff paid Ellis $8,000. Ellis admits in his answer "that said invention and the Letters Patent thereon were of great utility and of great value and has gone into extensive use."

3. The invention relates to the manufacture of insoles, with special reference to its application to the coating of the fabric and to use of the fabric in reinforcing insoles. It had long been the practice in the manufacture of shoes to reinforce insoles by cementing thereto a layer of duck or like textile fabric material shaped to the sewing lip, or rib, of the insole, to reinforce the lip, thereby forming a more secure anchorage for the inseam stitches. The usual practice had been to employ a strip of fabric of approximately the width of the insole, having coats of thermoplastic material which had to be heated just prior to its application to the insole in order to secure proper adhesion. The degree of heat required was relatively high, and considerable skill on the part of the operator was required in order to produce uniform results. Several disadvantages were found in this practice. It was commonly known as the "hot process". There was also, prior to Ellis's entry into the art with his patent, a process developed known as the "cold process", which had failed to meet with the general approval of shoe manufacturers. In view of the foregoing, Ellis provided, in his patent, a novel method of coating fabric and of using such fabric in reinforcing insoles. He used a suitable fabric, such as gem duck, coated in the web with a rubber composition. After heating and drying, the non-tacky web was then cut into strips and wound into rolls. The next step in the process was to apply a coating of rubber cement to the pre-coated material just before the strip was applied to the insole. This application is made by the shoe manufacturer. The fabric thus coated is then at once applied to the insole and "formed in" around the rib, or lip, usually with a hand tool.

4. The plaintiff, since 1929, has used a base coating composed of crude rubber with zinc oxide and resin, and has furnished its customers with a top coating material with practically the same ingredients, only in different proportions. Since 1932, however, it has used a base coating, and has provided manufacturers with a top coating, which included a certain percentage of 60 per cent. concentrated latex and other ingredients, the rubber content of each being about 35 per cent. of the whole. Neither the plaintiff nor its licensees use heat in the application of the top coat.

5. So far as we are concerned with the base coating, that of the defendants essentially follows the patent. The formula now used is rubber, R. P. A. No. 1 and naphtha. The controversy over infringement centers about the top coating. Defendant furnishes its customers for this purpose two kinds of coating, one containing a 60 per cent. concentrated latex, and the other a 52 per cent. concentrated latex. These coatings are not made by the defendant but are purchased from different concerns engaged in the manufacture of them. In each type an ingredient, a substitute for tragacath, is introduced. What that ingredient is, or what are its proportions, was not disclosed.

The question to be decided is whether this top coat, as it is used in defendants' process, is the equivalent of that of the patent and is within Claim 4 of the patent, which is the only claim in issue.

6. Claim 4 reads as follows:

"4. That improvement in methods of reinforcing insoles which comprises applying, at room temperature, to a strip of reinforcing material provided with a dry coating of a cement having a substantial rubber content, a coating of adhesive containing a relatively large amount of rubber and of such a character that it will be effective even when freshly applied to cause quick adhesion of the reinforcing material and the material of the insole, and applying to each other, still at room temperature, a portion of the coated strip and the insole to be reinforced."

All the claims of the patent are for a process but all except Claim 4 include specific reference to ingredients entering into either the base or the top coating, and in the latter always a resin, or rosin, is included in the description.

7. Defendants contend that their latex adhesives do not respond to the terms of Claim 4, if that claim is properly limited. This calls for a further consideration of the specifications of the patent, also of prior patents and the proceedings of the Patent Office relative to the patent in suit, in order to define the invention protected by Claim 4.

Plaintiff's assignor Ellis was not the first to discover a cold process, for he refers in his specification to unsuccessful attempts to develop such a process. He not only sought an improvement over the old cold

process but, what is more important, a process which would eliminate the necessity of heating to a relatively high degree of heat a thermoplastic material as it was being applied. He did this by providing a pre-coated duck treated with a "cold rubber cement composition containing rubber, a resin and a solvent." Then, prior to the use of the strip as reinforcing material, a coating of rubber cement is applied at room temperature. The specifications gave preferred formulae for both the base and top coatings, both of which involve the use of appropriate quantities of rubber, zinc oxide, Burgundy pitch and naphtha. According to the specifications: "This (second) coating, while it may advantageously be made up in general of ingredients similar to those used in the first coating, preferably has the ingredients in different proportions, * * *. The proportion of solvent in this composition is relatively small so that a cement having a high viscosity is produced and having, because of the high resin content, the requisite tackiness. * * * The solvent employed in the second coating is preferably one that will quickly evaporate substantially completely at ordinary room temperature. * * *"

Ellis describes the function of the second coating as follows:

"The composition for the second coating is applied to the strip while cold, that is at normal room temperature, the coating being very thick compared with the thickness of the first coat. As soon as the highly viscous and heavy second coating is applied to the strip, the strip is exposed to the air and the highly volatile solvent begins to evaporate from the exposed surface. At the same time the first coating is absorbing the solvent from the second coating so that in a very short time, in fact in a few seconds, sufficient solvent has been removed from the second coating to render it tacky instead of slimy or slippery, and hence it is in suitable condition for the application to the insole. Since the two coatings are of a similar nature, the rubber solvent absorbed by the first coating from the second coating softens the first coating so that the two coatings cohere and firm adhesion between strip and the insole is assured."

Thus we see that the necessity of heat was obviated and delay incident to the operation of the old cold process was avoided by applying to a pre-coated fabric a rubber cement composition which was highly viscous and which contained among its ingredients a volatile solvent so that absorption and evaporation together with a tack-producing ingredient gave a fabric with sufficient adhesive qualities to permit its immediate use in reinforcing insoles.

8. While conceding that the results obtained by defendants' process are identical with those obtained by the process of the patent, the defendants argue that the results are attained by means so dissimilar that they cannot properly be held to be equivalent to the means of the patent.

The argument is that rubber cement is a colloidal dispersion in rubber solvent, while latex is a colloidal dispersion in water. Defendants agree that they are both adhesives, and their expert testified that they were certainly equivalents "but not for all purposes and at all times."

It is also conceded that both the latex and the rubber cement develop adhesion as the liquid vehicle evaporates, and that in both cases the liquid evaporates slowly. The defendants say, however, that Ellis, plaintiff's assignor, avoided slow evaporation of the solvent by the rapid evaporation and rapid absorption of a highly volatile cement in the pre-coat. This is undoubtedly true, but it has already appeared in these findings that the defendant uses a volatile solvent in its pre-coat. The defendants point to the testimony of plaintiff's expert, to the effect that rubber in solvent, as described in the patent, co-acts in some way with the base coat but not exactly the same way as would the latex top coat, though the final result would be quite similar. I am satisfied that the adhesive powers of the twice-coated fabric are due to evaporation and absorption of the liquid, brought about by means that are well within any reasonable range of equivalents to which the patentee may lay claim under the broad language of Claim 4.

9. I find nothing in the cited prior patented art which would limit Claim 4 to a rubber-resin cement. These earlier patents teach that a latex is the equivalent of crude rubber dispersed in a solvent.

Nor do I find anything in the proceeding in the Patent Office that requires such a limitation to the claim. Ellis, in these proceedings, expressly disclaims any intention of claiming "a cement consisting of rubber, resin, a filler and a solvent."

He makes it clear that he is claiming a method in which such a cement was one of the compositions that might be used in a step of the process.

10. The defendants further contend that they do not infringe because heat is necessary or produces results which are an improvement over the cold process of the patent; in other words, that their process will not work satisfactorily at room temperature. I take the words "room temperature", as used in the claim in suit, to mean a temperature that involves the intervention of heat from some source in order to bring the temperature of the latex substantially above the normal temperature of the air in the room where the operation takes place.

During the course of the trial, the parties conducted a series of tests. Insoles were reinforced, using defendants' pre-coated fabric which had been top-coated with defendants' latex adhesive, both at room temperature and also with the latex heated to 115 degrees Fahrenheit. The defendants do not claim that the ultimate bond is any better with heated than with unheated latex. They do, however, contend that the heated latex permits speedier coating and forming. Operators of defendants' machine, who had never operated without heat, testified that the more the top-coat was heated, the quicker the "bite" when the insole was applied to the coated fabric. Another witness, who was familiar with the operation of defendants' process, saw no difference between defendants' heated and unheated adhesive.

During the inter partes test, above referred to, an attempt was made to measure the interval of time from the beginning of the reinforcing process until twenty insoles had been reinforced, with a view of determining whether the heated latex had a quicker "bite" than the unheated. Tested immediately after the coated fabric had been attached to the insole, no difference in tackiness was discovered. Defendants' expert, who was present, noted that the time actually required averaged 14 seconds longer when the unheated adhesive was used than when heated. I am unable to find, on all the evidence, that any substantial benefit is derived from the use of the heat, either in the ultimate bond or in rapidity of operation.

11. Plaintiff's manner of conducting its business was to supply shoe manufacturers, for use in reinforcing insoles, the pre-coated duck which it had slit into strips of suitable width; if the manufacturer desired, he supplied the duck and the plaintiff pre-coated and slit it. Plaintiff also supplied adhesive, to be applied to said pre-coated fabric at the shoe factory immediately prior to the application of the reinforcing material to the insole, and also machines suitable for use in applying said adhesive to said strips, the machines being and remaining the property of the plaintiff. These machines were covered by Letters Patent of the United States owned by the plaintiff. The plaintiff, in addition, gave instructions to operators, serviced the machines and advised and assisted in the reinforcing operation. As compensation for the foregoing, the plaintiff made a single charge to the shoe manufacturer at a rate per web yard of duck supplied to the manufacturer; and, if the manufacturer did not furnish the duck, the price of that material was added to the charge. The adhesives used by the plaintiff in pre-coating the duck have all had a large rubber content but were made according to different formulae, developed from time to time by the plaintiff with special reference to the purpose for which the material was to be used. The plaintiff did not grant written licenses to shoe manufacturers, nor was any such license ever requested. Neither by notice or by agreement in any form with its customers did it require them to use only plaintiff's material. The plaintiff adopted the foregoing method of utilizing the patented process, deeming it the most practical method for so doing.

12. The plaintiff, in 1932, gave to the Pepperell Manufacturing Company and to the H-B Products Company licenses to use the patented process. These licenses only granted rights to use machines and materials for performing a latex or nonsolvent top coating. These licensees, therefore, apply only, as a top coating, a latex type of adhesive, applied at room temperature. Their commercial practice is substantially identical with that of the plaintiff.

13. In 1938, the defendant Ellis began to develop and promote a process for reinforcing insoles, and the course of business adopted by his corporation followed closely that of the plaintiff. The shoe manufacturer was furnished with pre-coated fabric in rolls of the required width with

material for top coat and with machines for applying the top coat which were leased to the customer, the defendant agreeing to service the machines. For the materials, use of the machine, and the service rendered, the manufacturer paid according to the yardage of the pre-coated duck furnished by the defendant. The price per yard charged by the defendant was somewhat lower than the plaintiff's price. The defendant installed in its apparatus, furnished the shoe manufacturer, a heating element. Prior to the suit, these heating units were only 40-watt and 60-watt units. Since the suit, it has installed a 150-watt unit together with an automatic thermoswitch. I find that with the 60-watt heat unit, which was used prior to the suit, the temperature of the latex when applied was not above room temperature, as above defined. With the 150-watt unit, higher temperatures are obtained, but none anywhere near the 200 degree Fahrenheit, which was the temperature of the adhesive used in the old hot process and, as a matter of practice, there is no pretense of maintaining the temperature of the top coating at 120 degrees.

14. The early machine, which the defendant loaned for applying the top coat, bore a name plate which contained the following legend:

"Magic Tape Machine. Patent Applied For.

"This machine is part of a process for geming innersoles.

The process requires that the emulsion used in this machine be kept at a heat well above room temperature. This machine is loaned with the understanding that the above instructions will be carried out. Property of the Magic Tape Company, Medford, Massachusetts."

Later, the language on the name plate was changed to read that the emulsion must be kept at a heat of about 120 degrees. In all other respects the later name plate followed the earlier.

15. If, as some authorities hold (see Baldwin Rubber Co. v. Paine & Williams Co., 6 Cir., 99 F.2d 1), the question of infringement is one of fact, I find that Claim 4, properly construed, is infringed by the defendants' process.

### Conclusions of Law.

1. The defendants are estopped from attacking the validity of the claim in suit. This is conceded by the defendants.

■ 2. Claim 4, rightly construed, includes the defendants' process, and both defendants are guilty of infringement of that claim.

■ We are dealing with a claim which must be deemed valid, which is couched in language which does not limit the grant to the specifications, or to any formula contained therein. The claim is the measure of the grant. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721. The claim in issue defines both the base coating and the top coating. Defendants' pre-coating not only comes within the terms of the claim, but it follows closely the preferred formula of the specifications. The defendants' latex adhesive, of course, differs from the rubber cement of the specification. Nevertheless, it falls clearly within the terminology of the claim, which defines the top coat as (1) an adhesive containing a relatively large amount of rubber, and (2) of such a character that it will be effective even when freshly applied to cause quick adhesion of the reinforcing material and the material of the insole (3) at room temperature. There can be no doubt on the facts that defendant's top coat is an adhesive containing a relatively large amount of rubber and that it has the requisite characteristics of quick adhesion at room temperature.

■ Although the exact nature of defendant's latex adhesive, used as a top coat, is not known, it may be assumed that the latex does not co-act in exactly the same way as rubber dispersed in a volatile solvent. Proceeding on this assumption, defendants argue that, in their process, means are provided for accomplishing the object of the invention, which are different from those of the patent. With that contention, I am unable to agree. Defendants' method involves the process of evaporation and absorption at room temperature without the necessity of heat, consequently the same results are obtained by substantially similar means, and the rule which applies to equivalents must be applied. It may be observed that the patent is for a method, or process, and not for a composition of matter. The terms of the claim permit of equivalent means of producing strong and quick adhesion, and this although the patent may not be deemed a pioneer patent. Paper Bag Patent Case, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; Nachman Spring-Filled Corp. v. Spring

Products Corp., 2 Cir., 68 F.2d 829; Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59, 62.

■ As between assignor and assignee, the dominant equitable rule is that the construction of the patent must be broad and liberal enough to give full value to the patent assigned. Frick Co. v. Lindsay, supra.

■ Notwithstanding these departures from the specifications of the patent, the conclusion is inevitable that the defendants employ the principle and appropriate the substance of the claim in issue and, therefore, are infringers. See Baldwin Rubber Co. v. Paine & Williams Co., supra. A different view might be tenable if it had been shown that the introduction of heat substantially above room temperature was necessary to a satisfactory bond or quick adhesion, but such necessity was not established by the inter partes tests or by other evidence. The mere fact, if it be a fact, that heat somewhat improved the process would not be enough, under the circumstances of the case, to escape the charge of infringement. Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279; Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136.

Tilghman v. Proctor, supra, was a case involving a patent for a process. In the course of the opinion the court said (102 U.S. at page 733, 26 L.Ed. 279):

"The matter may be stated thus: Tilghman discovers a process of decomposing fats by mixing them with water, and heating the mixture to a high temperature under a pressure that prevents the formation of steam. It is a new process, never known before. The defendants seeing the utility of the process, and believing that they can use a method somewhat similar without infringing Tilghman's patent, put a little lime into the mixture, and find that it helps the operation, and that they do not have to use so high a degree of heat as would otherwise be necessary."

The court observes that—

"It may be an improvement to use the lime for that purpose; but the process remains substantially the same. The patent cannot be evaded in that way."

In the Westinghouse case, the court said that [170 U.S. 537, 18 S.Ct. 722, 42 L.Ed. 1136]—

"We have repeatedly held that a charge of infringement is sometimes made out, though the letter of the claims be avoided."

In Nachman Spring-Filled Corp. v. Spring Products Corp., supra, 2 Cir., 68 F. 2d at page 830, this statement is made:

"Infringement is not avoided by merely providing inventionless or colorable evasion of the terminology of the claims. We have recently restated the test to be whether the infringing device embodies the substance of the invention and accomplishes the objects of the invention in substantially the same way and by substantially the same or equivalent means. Colton Co. v. McKesson & Robbins [2 Cir.], 58 F.2d 157."

Other cases supporting this proposition are—Vortex Mfg. Co. v. Ply-Rite Contracting Co., D.C., 33 F.2d 302; American Bitumuls Co. v. Union Oil Co., D.C., 24 F. Supp. 795; Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 90 F.2d 178. All the above cited cases involve the application of heat, either to a cold process as in Vortex Mfg. Co. v. Ply-Rite Contracting Co., supra, or else the temperature used was lower or higher than that required by the specifications of the patent.

■ The defendants derive no aid from the instruction appearing upon its machine to the effect that the process requires that the emulsion be heated. Wheatley v. Rex-Hide, Inc., 7 Cir., 102 F.2d 940. See, also, Leeds & Catlin Co. v. Victor Talking Machine Co. (No. 2), 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816.

3. The plaintiff is not entitled to maintain this suit for contributory infringement.

The facts of the case at bar bring it within Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, and Leitch Mfg. Co. v. Barber Company, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, and the following decisions of lower courts: J. C. Ferguson Mfg. Works, Inc., v. American Lecithin Co., 1 Cir., 94 F.2d 729; Alemite Corp. v. Lubrair Corp., 1 Cir., 62 F.2d 899; American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207; Philad Co. v. Lechler Laboratories, Inc., 2 Cir., 107 F.2d 747.

■ The rule to be deduced from these cases is that although a patent may be valid and may be infringed, the owner may not invoke the aid of the court to enjoin, as a contributory infringer, one who sells (J. C. Ferguson Mfg. Works, Inc., v. American Lecithin Co., supra) or, as a direct infringer, one who buys (American Leci-

thin Co. v. Warfield Co., supra), an unpatented article of commerce to be used in the patented process.

The latest statement of the rule is found in Ethyl Gasoline Corp. v. United States, 60 S.Ct. 618, 625, 84 L.Ed. ——, decided March 25, 1940, where the court states that a patentee "may not, by virtue of his patent, condition his license so as to tie to the use of the patented device or process the use of other devices, processes or materials which lie outside of the monopoly of the patent licensed; * * *."

Another recent case is Philad Co. v. Lechler Laboratories, Inc., supra, in which the Circuit Court of Appeals for the Second Circuit defined and applied the rule. In this case the Philad Co., owners of a patent on a process for imparting a permanent wave to the hair, brought suit charging defendants with contributory infringement in that they sold appliances, designed for use in waving the hair by the patented process, with knowledge that purchasers were to use the appliance in waving hair by that process. The Philad Company did not use the patented process, nor did it collect royalties from hairdressers for its use; instead it issued licenses to different concerns, manufacturing hair-waving equipment, with authority to sub-license the process to purchasers of the equipment. Judge Patterson, speaking for the court, referring to the Carbice and Leitch Mfg. Co. cases, said [107 F.2d 748]:

"Obviously these decisions present an important limitation on the doctrine of contributory infringement as formerly understood. * * * On contributory infringement the distinction at present is between the case where an owner of a patent exploits it in the ordinary manner and the case where he employs it primarily as a means of suppressing competition in unpatented materials used in connection with it. The present cases are obviously of the latter type. The patent sought to be enforced is on a process of waving hair. It does not give the plaintiff a monopoly in the appliances by which the process is operated. Yet the plaintiff's course of conduct shows plainly that the sole use made of the patent is to suppress competition in the appliances. It is not entitled to relief against those who sell such appliances without its leave."

In this case it also appeared that the rule was not to be limited to efforts of a patentee to control the use of *staple* materials. Emphasis was laid "on the fact that the articles handled by the alleged contributory infringers were not covered by the patent, and on the further fact that the patentee by his method of doing business was using his patent as if it did cover such articles."

In the Ninth Circuit, in Johnson Co. v. Philad Co., 96 F.2d 442, the Circuit Court of Appeals reached a different conclusion respecting the extent of the monopoly of the patented process of the Philad Co. It is my opinion that the decision of the Circuit Court of Appeals for the Second Circuit, in Philad Co. v. Lechler Laboratories, Inc., supra, is more consistent with the decisions of the Supreme Court cited above.

■ The owner may refuse to exploit his patent, he may practice it or he may grant licenses and exact royalties or license fees (Ethyl Gasoline Corp. v. United States, supra), but if he "adopts a method of doing business which is the practical equivalent of granting a written license with a condition that the patented method may be practiced only with" materials purchased from the owner, he thereby extends his monopoly beyond the limits of the grant of the patent. Leitch Mfg. Co. v. Barber Co., supra, 302 U.S. at page 460, 58 S.Ct. at page 289, 82 L.Ed. 371.

In the case at bar, as in Leitch Mfg. Co. v. Barber Co., supra, there was only an implied license to use the process, with no notice or agreement requiring the licensee to buy materials of the owner. Nevertheless, the Supreme Court held, in Leitch Mfg. Co. v. Barber Co., supra, that these facts were without legal significance, adding that—

"The Court held in the Carbice Case that the limitation upon the scope or use of the patent which it applied was 'inherent in the patent grant.' It denied relief, not because there was a contract or notice held to be inoperative, but on the broad ground that the owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention."

■ Thus it appears to be decided by the Supreme Court that it is not necessary that a patent owner undertake to suppress competition by warnings to the trade, or

by imposing restrictions upon a licensee in order to unduly extend the grant. A method of doing business which leads to such suppression of competition in unpatented commodities will be enough, under the Leitch Mfg. Co. case, to prevent success in a suit against a competitor for contributory infringement.

The question presented, therefore, is whether the plaintiff by its method of doing business is seeking to extend its monopoly to unpatented materials used in practicing its process.

In the instant case, plaintiff grants no written licenses to shoe manufacturers. The plaintiff furnishes them the pre-coated fabric and the top-coated material and provides and services machines for use in the second step of the process. It does not exact any royalty for the right to use the patented method. Its profits are derived from, and measured by, material furnished by it to the manufacturer. This is not a case where an owner exploits his patent in the usual way. The defendant's latex adhesive is not manufactured by it exclusively for use in the patented process. It is a product manufactured by other concerns and bought and sold in the market. Clearly, the plaintiff's monopoly cannot extend to this product, even though it may be made according to a secret process controlled by the manufacturers of the latex compounds. See International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Oxford Varnish Corp. v. Ault & Wiborg Corp., 6 Cir., 83 F.2d 764.

Whether defendant's machines infringe plaintiff's patent is a question not now in issue. For the purposes of this suit they are to be treated as unpatented devices. Philad Co. v. Lechler Laboratories, Inc., supra.

The fact that plaintiff's method of conducting its business is the most practical method is not a controlling factor. The question cannot be decided as a matter of convenience to either plaintiff or defendant. I agree that it would probably not be practicable for the plaintiff to practice the invention in its plant, but I am not impressed with the suggestion that it would not be feasible to issue licenses to shoe manufacturers.

Plaintiff's complaint may be dismissed.